ANNUNZIATA, J.,
dissenting.
I respectfully dissent from the majority opinion. 7-Eleven claims on appeal that the trial court applied the wrong standard of review and that it erroneously affirmed the Department of Environmental Quality’s damages analysis. 7-Eleven specifically claims that the Department erroneously: 1) failed to award reimbursement for temporary damages, including lost rental income, carrying costs, lost profits, and lost investment income; 2) failed to properly consider the opinions of qualified experts; 3) failed to apply the “common law factors traditionally used to evaluate the reasonableness and necessity of a settlement”; and 4) erroneously conducted a “de novo examination of the evidence” to determine whether its settlement was reasonable and necessary. The claims that 7-Eleven raises involve issues of law and fact and implicate different standards of review on appeal. For the reasons that follow, I would affirm the trial court’s judgment in this case.
I. Background
The record makes clear that the Department considered the settlement reached between 7-Eleven and Hechinger, but that *98 it rejected the figure proffered, finding it to be an inaccurate reflection of the reasonable and necessary costs incurred as a result of injury to Heehinger’s property. The injury in question was caused by leakage from an underground petroleum tank located on 7-Eleven’s property. The Department rejected the settlement figure on two grounds. First, it rejected the settlement amount as neither “reasonable [nor] necessary” because it found the law and the evidence failed to support certain elements of the claim. Second, the Department rejected 7-Eleven’s contention that it was required to determine the reasonableness and necessity of the settlement amount by considering “the appropriate settlement range” found in similar, litigated claims and that the Department was, therefore, precluded from considering, de novo, whether the underlying evidence supported 7-Eleven’s claim for reimbursement.
II. Standard of Review
Although decisions by administrative agencies regarding matters within their specialized competence are “entitled to special weight in the courts,” Johnston-Willis, Ltd. v. Kenley, 6 Va.App. 231, 244, 369 S.E.2d 1, 8 (1988), “when, as here, the question involves an issue of statutory interpretation, ‘little deference is required to be accorded the agency decision’ because the issue falls outside the agency’s specialized competence.” Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (quoting Kenley, 6 Va.App. at 246, 369 S.E.2d at 9). “In sum, pure statutory interpretation is the prerogative of the judiciary.” Id. In the case before the Court, the Department’s interpretation of Code § 62.1-44.34:11(A)(2), and its determination that certain damages are not recoverable as a matter of law, must, therefore, be reviewed in accordance with the least deferential standard of review. Id. The Department’s factual determinations, however, are entitled to great deference. Holtzman Oil Corp. v. Commonwealth, 32 Va.App. 532, 539, 529 S.E.2d 333, 337 (2000) (“Where the issue is whether there is substantial evidence to support findings of fact, great deference is to be accorded the agency decision.”).
*99 III. The Trial Court Did Not Err in Affirming the Agency’s Damages Analysis
7-Eleven contends that the trial judge erred in affirming the Department’s damage analysis under which it rejected its claim for both permanent and temporary damages, including lost rental income and various carrying costs. In support of its contentions, 7-Eleven relies on the general principle enunciated in Lochaven Co. v. Master Pools by Schertle, Inc., 233 Va. 537, 357 S.E.2d 534 (1987), that “[t]he measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct.” Id. at 541, 357 S.E.2d at 537. The general principle, albeit applicable, does not necessarily support the conclusion that the particular damages sought are recoverable in their entirety. Numerous, specific principles of law defining appropriate damages in cases involving tortious injury to real property have equal, if not greater, relevance to this Court’s resolution of the question. The Department properly accepted these specific principles of law in determining the reasonable costs incurred by 7-Eleven in settling its litigation with Heehinger.
A. The Department Did Not Use An Improper Measure of Damages
Two concerns animated the Department’s consideration of 7-Eleven’s request for reimbursement of its costs in this case: the avoidance of double recovery and the application of relevant law governing recovery of damages for injury to real property. To determine whether 7-Eleven’s claimed damages were reasonable and necessary, the Department discussed and applied the following principles.
The measure of damages for permanent injury to property is the diminution, in the market value of the property, viz., the difference between the market value of the property before and after the injury. The Department cited four Virginia cases in support of that proposition: Packett v. Herbert, 237 Va. 422, 377 S.E.2d 438 (1989); Douthat v. Chesapeake & Ohio Ry. Co., 182 Va. 811, 30 S.E.2d 578 (1944); Norfolk & Western Ry. Co. *100 v. Richmond Cedar Works, 160 Va. 790, 170 S.E. 5 (1933); and Raleigh Court Corp. v. Faucett, 140 Va. 126, 124 S.E. 433 (1924). When damages to real property are deemed to be permanent, temporary damages, including lost rental income, are not recoverable. For this proposition, the Department relied on the holding in Georgia v. City of East Ridge, Tenn., 949 F.Supp. 1571 (N.D.Ga.1996).[5] Equally relevant to whether both temporary and permanent damages for injuries to real property are recoverable is the proposition that where temporary damages, such as cost of repair, exceed the diminution of market value, damages are limited to the diminution of market value. The Department cited United States Steel Corp. v. Benefield, 352 So.2d 892 (Fla.Dist.Ct.App.1977), in support of this proposition. It also cited the Virginia Supreme Court case, Averett v. Shircliff, 218 Va. 202, 237 S.E.2d 92 (1977), as authority for an analogous principle which it expected to apply in addressing evidence which established that the contamination to the Hechinger property had been “partially cured.” That principle states that, where evidence of repair and depreciated value after repairs exists, the proper measure of damages is the lower of 1) the difference in the fair market value of the property before and after the accident, or 2) if the property could be restored to its former condition, the cost of repairs, plus applicable depreciation. Averett, 218 Va. at 207-08, 237 S.E.2d at 95-96. Finally, to address evidence in the case which showed that factors other than contamination were relevant to determining the post-injury value of the subject property, the Department cited the Virginia Supreme Court case of TechDyn Sys. Corp. v. Whittaker Corp., 245 Va. 291, 427 S.E.2d 334 (1993), for the proposition that “where there is evidence of damage from several causes, for a portion of which a defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible.” Id. at 296, 427 S.E.2d at 337.
*101 Applying the least deferential standard of review articulated in Sims Wholesale to the Department’s conclusions of law, I would find no error in its reliance on the legal principles it cited. Other authorities cite the same principles as governing. Thompson on Real Property, for example, sets forth the following:
When a plaintiff recovers permanent damages for harm to property, those damages are measured by depreciation in the market value of the property. Those damages are measured by whatever depreciation in the market value of the property has been caused by the nuisance. Loss of rental value may be the appropriate measure of damages, if the property itself is not harmed but its usefulness has been impaired. A plaintiff may not recover permanent damages for both the loss of market value and loss of rental value. If temporary damages are recovered for harm to property, those damages are measured by the loss of the rental value or loss of use value of the property as a result of or during the continuance of the nuisance.
8 Thompson on Real Property § 67.06(a)(2), at 119-20 (David A. Thomas ed.1994) (footnotes omitted); see also 9 Powell on Real Property § 64.07[3], at 64-42 (Michael Allan Wolf ed., Matthew Bender) (“When the harm caused by a nuisance is only temporary and can be abated, the measure of damages normally is the depreciation in the rental or use value of the affected property.... Wdien harm is permanent, damages are measured by the decrease in the fair market value of the property.” (footnotes omitted)); 1 Dan B. Dobbs, The Law Of Torts § 57, at 113 (2001) (“Courts are generally reluctant to approve recovery for repairs or restoration when costs exceed the amount by which the land’s value has been diminished.”); Id. at 115. (“If the defendant’s nuisance or trespass continues to cause harm to the plaintiffs interests in land, courts usually begin by classifying the invasion as either permanent (completed) or temporary and continuing.... The permanent ... damages measure is usually the diminished value of the land resulting from the invasion.” (footnotes omitted)); 1 Dan B. Dobbs, Law of Remedies § 5.1, at 711 (2d. ed.1993) (“Quite *102 commonly, ... in the case of physical harms to the property itself, the measure is the diminished value of the land caused by the trespass.” (footnote omitted)); Id. § 5.6(1), at 754 (“If the effects of the nuisance are more or less permanent, the diminution in land value due to the nuisance will be recoverable; if temporary, the diminished rental value during the period of harm.”); see also Walker Drug Co. v. La Sal Oil Co., 972 P.2d 1238, 1246 (Utah 1998).
Recovery for both permanent and temporary damages in cases involving real property injuries is generally excluded on the ground that the recovery is duplicative. Patrick v. Sharon Steel Corp., 549 F.Supp. 1259, 1265 (N.D.W.Va.1982) (“the motivating factor behind distinguishing between temporary and permanent damages [is] the prevention of a double recovery for permanent damages”); 58 Am.Jur.2d Nuisances § 276. Generally, diminution in value of the property constitutes the upper limit of recovery. When permanent damages are awarded or temporary damages exceed the value of the property, temporary damages are not appropriate because an award for both would constitute a duplicative recovery. See Beam v. Birmingham Slag Co., 243 Ala. 313, 10 So.2d 162, 164 (1942); 58 Am.Jur.2d Nuisances § 276; see also Averett, 218 Va. at 207-08, 237 S.E.2d at 95-96.[6]
In my view, 7-Eleven’s claim that the Department erroneously denied recovery for both permanent damages and temporary damages, such as rental income and carrying costs, is not supported by the law of damages as set forth in Virginia law and in our sister states. 7-Eleven presents no argument to refute the validity of the principles governing the measure of damages for permanent injuries to real property, save the general principle of law set forth in Lochaven which allows recovery of all proximately caused damages. That general principle, however, does not nullify or subordinate the specific principles upon which the Department relied in determining whether the reimbursement 7-Eleven sought was reasonable *103 and necessary. I would, therefore, hold that the Department applied the correct legal principles to its damages analysis and that the trial court properly affirmed that decision.
B. The Department’s Findings of Fact in Determining 7-Eleven’s Reasonable Costs Are Supported by Substantial Evidence
Having determined the applicable legal principles, the Department evaluated the evidence presented in support of 7-Eleven’s claim in light of those principles. This analysis was fact-based and resulted in factual findings that are entitled to deference by the reviewing court. Holtzman, 32 Va.App. at 539, 529 S.E.2d at 337. The trial court may not substitute its own independent judgment for that of the agency and will only reverse an agency’s factual findings if not supported by substantial evidence. Volkswagen of Am., Inc. v. Quillian, 39 Va.App. 35, 49, 569 S.E.2d 744, 751 (2002), rev’d on other grounds sub nom. Volkswagen of America, Inc., v. Smit, 266 Va. 444, 587 S.E.2d 526 (2003). I would find that the trial court did not err in affirming the decision of the Department because it is supported by substantial evidence.
The record discloses that the Department reviewed the settlement figure proffered by 7-Eleven and the evidence supporting it. Based on this review, the Department found that the reimbursement 7-Eleven sought was not reasonable and necessary, and it set the award at $103,117. In reaching this conclusion, the Department first found, as fact, that the injury to the Hechinger property attributable to the leakage of petroleum from an underground tank located on 7-Eleven’s property was permanent in nature. Its conclusion was based on the following evidence:
Upon site closure, contamination remained on the Heehinger property. The Regional Office’s July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take natural attention [sic] to return the site to background levels. Southland provided no evidence and no evidence exists in the Agency’s records that indicates the *104 remaining contamination will attenuate within a known time frame.
The conclusion that the injuries to the Hechinger property were permanent in nature is supported in the record. Indeed, that finding is undisputed. The Department’s conclusion is also consistent "with the definitions of permanent and temporary injuries. “Whether contamination by toxic waste is a permanent or continuing injury turns on the nature and extent of the contamination; the crucial test of the permanency of a trespass is whether the trespass can be discontinued or abated.” Mangini v. Aerojet-General Corp., 12 Cal.4th 1087, 51 Cal.Rptr.2d 272, 912 P.2d 1220, 1226 (1996) (citations and quotations omitted).
Turning then to the task of determining the reasonable and necessary cost for the permanent damage to Hechinger’s property, the Department applied the formula set forth in Faucett, Douthat, and Richmond Cedar Works. The formula is based on the difference between the fair market value of the property before and after the injury. See 22 Am.Jur.2d Damages § 405.
The Department determined that the property’s fair market pre-injury value was between $903,177 and $938,700. Its finding was based on evidence of the County assessment of the property and the actual price Hechinger paid for the property two years before the pollution report. It specifically rejected Heehinger’s 1990 asking price of $1,550,000 for the property as an accurate pre-injury value, finding that it was forty percent higher than the price Hechinger paid for the property less than two years earlier and significantly inflated. For similar reasons it rejected the opinion offered by one of Hechinger’s experts, Lawrence A. Salzman, who stated the pre-injury value to be $1,300,000. 7-Eleven’s expert, Joseph B. Call, III, opined that the property’s pre-injury value was $715,000, a figure substantially below that which the Department considered fairly derived. In short, the Department gave more weight and credence to evidence of the property’s assessed value and evidence of its purchase price two years *105 before the contamination occurred in reaching its conclusion that the fair market value of Hechinger’s property pre-injury was $903,117. I cannot say that this finding is not supported by substantial evidence. Quillian, 39 Va.App. at 49-50, 569 S.E.2d at 751-52 (“ ‘The reviewing court may reject the agency’s findings of fact only if, considering the record as a whole, a reasonable mind necessarily would come to a different conclusion.’ ” (quoting Kenley, 6 Va.App. at 242, 369 S.E.2d at 7)); see also Jules Hairstylists, Inc. v. Galanes, 1 Va.App. 64, 69, 334 S.E.2d 592, 595 (1985) (“We do not retry the facts before the [agency], nor do we review the weight, preponderance of the evidence, or the credibility of witnesses. If there is evidence or a reasonable inference that can be drawn from the evidence to support the [agency’s] finding, they will not be disturbed by this court on appeal.”).
To calculate the property’s diminution in value the Department also had to determine the property’s post-injury fair market value. In doing so, the Department considered the opinions proffered by Hechinger’s and 7-Eleven’s experts as well as a post-injury offer to purchase the land for $800,000. It rejected the former and credited the latter. It explained its decision to credit the offer of purchase as an accurate measure of the property’s fair market post-injury value, noting that use of the post-injury offer to purchase was made by a potential purchaser of the site in July 1996, after the “majority of the cleanup expenses already had been incurred.” It concluded:
It is not unreasonable to assume that the buyer was aware of the condition of the parcel and that the current condition was reflected in the offer price. Because the bulk of the cleanup had occurred at that point, using this figure in the diminution of property value calculation would not result in a double recovery to Southland.
The Department made its award of $103,117 by calculating the difference between $903,117 and $800,000. Its reasoning follows:
Based on the valuation information provided, a reasonable range for the permanent damages was between $138,700 *106 and 103,117 (i.e., $938,700 or $903,117 minus $800,000). It is not necessary to make an adjustment to reflect partial cure costs, because the $800,000 offer appeared to be from an arms-length buyer and was made at a time when the cure of the property was nearly complete. Additionally, the evidence does not clearly demonstrate that topographical problems at the site affected the offer price. Therefore, the claimant will be given the benefit of the doubt on this issue, and no adjustment will be required to address this alleged cause of reduced property value. For the foregoing reasons, third party claim costs in the amount of $103,117 are approved, as this amount reflects actual market values.
I cannot say that substantial evidence does not support the Department’s determinations of the property’s value before and after the injury. As such, the Department’s conclusions were properly affirmed by the trial court.
In my view, 7-Eleven’s contention that the Department erred in rejecting the opinions of post-injury value proffered by 7-Eleven’s and Hechinger’s experts is without merit, and I would affirm the trial court’s decision to affirm the Department’s rulings on this issue.
7-Eleven raises three points to support its argument on this issue. It contends that because the experts were “qualified and employed accepted methodologies” in formulating their opinions, the Department’s decision was arbitrary and capricious. This argument overlooks the standard of review that governs fact-based determinations by the Department. Quillian, 39 Va.App. at 49, 569 S.E.2d at 751 (“ ‘The sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency’s decision.’ ” (quoting Kenley, 6 Va.App. at 242, 369 S.E.2d at 7)). It also fails to consider that the Department rejected the experts’ opinions because their underlying premises, in part, were not consistent with the law of damages which the Department concluded applied.
*107 As noted above, the Department found the pre-injury valuations given by 7-Eleven’s experts were not “credible” in light of the “County’s assessment of the property and the amount Heehinger actually paid for the property less than two years before the contamination was discovered.” This finding of fact establishing the property’s pre-injury value is supported by substantial evidence and may not be rejected unless “ ‘considering the record as a whole, a reasonable mind necessarily would come to a different conclusion.’ ” Id. at 50, 569 S.E.2d at 751-52 (quoting Kenley, 6 Va.App. at 242, 369 S.E.2d at 7).
The Department’s rejection of the experts’ appraisals of post-injury fair market valuations was based on both findings of fact and the application of law. The record supports the Department’s conclusions.
The record discloses that Salzman provided two evaluations. He first established a market value for the property in the amount of $1,300,000. That figure did not take the property’s contamination into account, and was properly rejected by the Department as not relevant to its determination of post-injury damages. In subsequently addressing the value of the property post-contamination, Salzman used an analysis based on estimates of Hechinger’s lost investment income, lost rental income, carrying costs, including tax payments and expenses for legal assistance and environmental experts. These elements of temporary damages and an analysis based on them do not comport with the legal measure of damages enunciated by numerous authorities which require a comparison of property’s fair market value before and after injury. See supra Part III.A; see also Packett, 237 Va. 422, 377 S.E.2d 438; Douthat, 182 Va. 811, 30 S.E.2d 578; Richmond Cedar Works, 160 Va. 790, 170 S.E. 5; Faucett, 140 Va. 126, 124 S.E. 433; 5 C.M.J., Damages, § 34 (2003) (“The general rule is that the proper measure of damages for injury of a permanent nature to real estate is the difference between its market value immediately before the injury and its market value immediately after the injury.” (footnote omitted)). Indeed, there is no authority to support the inclusion of the factors Salzman *108 considered in determining the post-injury fair market value of real property.
The record discloses that Call’s opinion was likewise segmented into two. In his report, Call opined that the post-injury market value of the property was $715,000. That figure also failed to take into account the property’s contamination and its effect on market value; Call found that the contamination was not relevant to determining the property’s value. Instead, he found that the property’s market value was adversely impacted by the site’s severe topographical constraints. Call’s opinion thus did not reflect the diminution in value suffered by the property pre- and post-injury as a result of the contamination. As such, his opinion was properly rejected by the Department. Subsequently, Call was asked to render an opinion on the market value of the property in light of the contamination. In his response, he confined his analysis to that portion of the site that was contaminated, an area of about one acre, or approximately one-tenth of the entire parcel. He concluded that the present value of the damages to that particular portion of the site was $102,000. He based his estimate of damages on the conclusion that this one acre portion of the site “could not be employed for its highest and best use in 1990” and calculated the loss as total. The Department properly rejected Call’s opinion to determine damages because his initial opinion did not consider the contamination of the site, and his second opinion did not address the entire site, with all its attendant problems, both topographical and toxic.
7-Eleven argues that Call’s second figure, $102,000, nonetheless represents the diminution of market value of the property before and after injury. The record fails to support that conclusion, factually or logically, because it presumes that the total site’s fair market value post-injury can be equated with the diminution in value of one segment of that property. Indeed, Call’s own opinion belies the conclusion: his first estimate of post-injury fair market value took into consideration the entire tract of land, including the contaminated *109 portion, and he found that the site’s value was not diminished by the portion contaminated.[7]
Finally, the Department rejected the appraisal given by Heehinger’s expert, Salzman, because it also “assumed no contamination was present on the property and appeared to conclude that the substantially lower property value was due to [severe] topographical problems.”
In summary, the Department concluded that the opinions proffered by 7-Eleven’s and Hechinger’s experts either failed to provide a fair market value of the property with the contamination factored in, or provided estimates of fair market value based on improper considerations. In my view, the trial court did not err in affirming the Department’s exclusion of the experts’ opinions in evaluating 7-Eleven’s claim for reimbursement under the Fund.
I would also affirm the trial court’s decision finding that the Department did not err in excluding recovery for temporary damages, including lost rental income, and carrying costs, such as lost investment income, taxes, and insurance costs. The Department’s decision was consistent with settled principles that recovery for both permanent and temporary damages are not recoverable. See supra Part III.A. The Department’s decision was also consistent with the legal principle that when temporary damages exceed permanent damages, only the latter are recoverable.[8] See 8 Thompson on Real Property, supra, § 67.06(a)(2), at 119-20; Beam, 10 So.2d at *110 164; 58 Am.Jur.2d Nuisances § 276; see also Averett, 218 Va. at 207-08, 237 S.E.2d at 95-96 (by implication).
In addition to rejecting the claims for temporary damages as not consistent with the principles regarding the proper measure of damages, the Department also declined to award temporary damages based on certain factual findings that it made. For example, it rejected evidence that Hechinger had lost rental income in the amount of approximately $719,000. That evidence was presented by Heehinger’s expert, Lawrence Salzman. He applied a formula using the pre-injury value he gave to the site in the amount of $1,300,000 to determine the rental income the site could have generated. The pre-injury value of $1,300,000 was properly rejected by the Department as unreliable because it failed to take contamination into account. It follows that his estimate of lost rental income is equally unreliable and was properly rejected by the Department.
The Department further determined, as a matter of fact, that the evidentiary premise underlying the claim for temporary damages such as carrying costs, lost profits, lost investment income, and lost rental income was wanting. That premise rested on Salzman’s opinion that Hechinger could not sell the property in 1990 because of its contaminated state and that it therefore incurred such temporary damages. The opinion was thus based on the assumption that, had the property not been contaminated, a sale of the property would have been realized. The Department found, however, that Hechinger’s failure to sell the property was due to Hechinger’s asking price for the property, which it determined was inflated considering other evidence of value in the case.[9] The Department’s factual determinations of the reasons behind the property’s failure to sell are entitled to deference and must be affirmed when supported by the evidence.
*111 In conclusion, I would find that the Department properly considered and then rejected the settlement reached by 7-Eleven and Hechinger as conclusive evidence of “reasonable and necessary” costs because, as a matter of law, Hechinger was not entitled to some of the damages it claimed and, as a matter of evidence, proof of certain elements of the claim was wanting. I would, therefore, find that the trial court did not err in affirming the Department’s application of law regarding the proper measure of damages in this case and its determination, based on the evidence and the relevant legal principles, that $103,117 constituted the reasonable and necessary costs 7-Eleven had incurred as a result of the contamination sustained by the Hechinger property.
IV. The Agency Was Not Required to Apply Common Law Factors And Did Not Err In Conducting An Independent Review of the Evidence To Determine Whether 7-Elev-en’s Settlement Was Reasonable and Necessary
7-Eleven’s final argument in support of its claim that the Department erred in its damage analysis is premised on a claim that the Department failed to apply traditional common law principles governing the evaluation of settlements and that, as a result, it erred in conducting an independent, de novo review of the evidence underlying its claim. I would find no error in the Department’s rejection of these contentions and the trial court’s affirmance of that decision because, in my view, Code § 62.1-44.34:11(A)(2) does not permit the review 7-Eleven urges.[10]
The Code is silent on the question of whether the agency is required to determine the settlement’s reasonableness and *112 necessity by applying common law factors of evaluation and by not reviewing the underlying evidence in support of the claim. The sole reference to “settlement” is found in Section VIII of the Fund Guidelines, promulgated by the DEQ in 1998, after the institution of this action but before the Department decided the case. The reference is general in import and, like the statute, lacks definition of the factors to be considered. The Guidelines are explicit about one aspect of the Department’s review, however: they clearly put claimants on notice that the Department will not necessarily make reimbursements reflecting the full settlement amount.
The statutory silence regarding whether the Department must apply a traditional common law analysis to determine the reasonableness and necessity of a settlement and that it not consider the underlying evidence in support of the claim, gives rise to an ambiguity that is subject to interpretation by the parties, the Department, and, ultimately, by the court. Virginia Dep’t of Labor & Industry v. Westmoreland Coal Co., 233 Va. 97, 101, 353 S.E.2d 758, 762 (1987). A statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning. Brown v. Lukhard, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985); cf. Winston v. Richmond, 196 Va. 403, 408, 83 S.E.2d 728, 731 (1954) (noting “that which is plain needs no interpretation”).
A. The Language of Code § 62.1-44.34:11(A)(2) Does Not Support 7-Eleven’s Interpretation By Implication
The principles of law that govern statutory construction are well settled. See, e.g., Grillo v. Montebello Condominium Unit Owners Ass’n, 243 Va. 475, 477, 416 S.E.2d 444, 445 (1992); Shackelford v. Shackelford, 181 Va. 869, 877, 27 S.E.2d 354, 358 (1943); Watkins v. Hall, 161 Va. 924, 930, 172 S.E. 445, 447 (1934). Where terms are not explicitly found in the statute, they may be implied if necessary. Norfolk Southern Ry. Co. v. Lassiter, 193 Va. 360, 365-66, 68 S.E.2d 641, 645 *113 (1952). “ ‘A statute often speaks as plainly by inference, and by means of the purpose that underlies it, as in any other manner. A policy that is clearly implied is as effective as that which is expressed.’” Id. at 364, 68 S.E.2d at 643 (quoting Leitner v. Citizens Casualty Co., 135 N.J.L. 608, 52 A.2d 687, 690 (1947)). However, not all omitted terms may be necessarily implied. “A necessary implication ... is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.” First Nat’l Bank v. De Berriz, 87 W.Va. 477, 105 S.E. 900, 901 (1921). Consideration of the object of the statute and the purpose to be accomplished may also clarify the legislative intent. Virginia Electric & Power Co. v. Board of County Supervisors, 226 Va. 382, 388, 309 S.E.2d 308, 311 (1983).
7-Eleven argues that the Department’s duty to review settlements using common law factors must be read into the statute by implication. It reasons that 1) Code § 62.1-44.34:11(A)(2) permits reimbursement for the payment of judgments that have been awarded as a result of litigating property damages claims and 2) the legislature, therefore, “obviously anticipated that litigation ... would occur, which means settlements, too, were obviously contemplated.” From those premises, 7-Eleven concludes that “the legislature is presumed to intend that the common law as it had developed when the statute was enacted would provide the applicable law for statutory interpretation [regarding the factors to be used in determining whether a settlement is reasonable and necessary].” 7-Eleven reasons that the factors are “inherent” in the evaluation of settlements. Accepting 7-Eleven’s reasoning arguendo that such factors are “inherent” in the review of settlements in the context of litigation, it does not follow, without more, that the legislature intended the same analysis be applied in an agency context.
The common law factors that 7-Eleven finds integral to and necessarily implied into the statute are set forth in three cases: Pickett v. Holland America Line-Westours, Inc., 145 Wash.2d 178, 35 P.3d 351 (2001); Community Care Centers, Inc. v. Indiana Family and Social Services Admin., 716 *114 N.E.2d 519 (Ct.App.Ind.1999); and Dauphin Deposit Bank and Trust Co. v. Hess, 556 Pa. 190, 727 A.2d 1076 (1999). Under the common law, the criteria generally used in assessing the reasonableness of settlement in the context of litigation
include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement.
Dauphin, 727 A.2d at 1078.[11]
On this record, I cannot conclude that the interpretation 7-Eleven seeks the Court to read into the statute by implication is “so strong in its probability that the contrary thereof cannot reasonably be supposed.” I cannot do so on three grounds, each of which supports a contrary proposition: 1) the legislative object and purpose underlying the establishment of administrative agencies militates against such an interpretation; 2) the purported legislative intent to abrogate the fact-finding authority of the agency is not consonant with settled legal principles of review and is not clearly expressed in the statute; and 3) claims for disbursement under the statute would receive disparate treatment depending on how the third-party claim is resolved. I address each ground in turn.
As stated by the majority opinion, one ostensible statutory object and purpose of Code § 62.1-44.34:11(A)(2) is to “provide a prompt and efficient means of abating pollution caused by underground storage tanks and to facilitate payment of compensation to third parties who have suffered ... property damage caused by release of petroleum from underground *115 storage tanks.” However, I believe the question before the Court implicates other objects and purposes that must be considered to properly construe the legislature’s intent. Notably, the legislature enacts laws establishing administrative bodies in order to delegate certain authority to them. In adopting such legislation, the legislative body delegates to administrative agencies those tasks which lie within an agency’s competence. Virginia Alcoholic Beverage Control Com. v. York Street Inn, Inc., 220 Va. 310, 313, 257 S.E.2d 851, 853 (1979). Absent clear indicia that the legislature intended to delegate to the agency adjudicative responsibilities that are beyond its expertise, I would find that it did not. “Complex problem[s]” should be decided by an administrate agency “in the light of its administrative experience and knowledge.” Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 543, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568 (1943). It cannot be said that the Department’s administrative experience, knowledge, expertise and competence extend to the application of the common law factors used to evaluate settlement figures, factors which were developed in the context of litigation in courts of law. Indeed, there has been no showing that such an analysis is within the Department’s special competence, nor can any such competence be presumed.[12]
Second, I would find that 7-Eleven’s interpretation may not be implied from Code § 62.1-44.34:11(A)(2) because, to do so, would abrogate settled principles of agency review. 7-Eleven contends that the Department is not only required to evaluate a settlement figure based on common law factors used in evaluating the reasonableness of settlements in a litigation context; it further contends that the Department may not look behind the settlement to examine and evaluate, de novo, the *116 evidence underlying such a settlement. 7-Eleven’s position is inconsistent with the object of the statute and overlooks the purposes to be accomplished. There is no question that the legislature intended to facilitate the payment of compensation to parties whose property was damaged by the release of petroleum from underground tanks. However, an equally important legislative purpose is reflected in its decision to interpose a state agency in the compensation process and to delegate to that agency the authority to implement it. In delegating such authority to the Department, the legislature expressly defined its role. It authorized the Department to determine whether the reimbursement for costs is reasonable and necessary. In employing such terms as, “reasonable and necessary,” the legislature made clear that the authority delegated to the Department is not simply or purely ministerial. “A ministerial act is ‘one which a person performs in a given state of facts and prescribed manner in obedience to the mandate of legal authority without regard to, or the exercise of, his own judgment upon the propriety of the act being done.’ ” Richlands Medical Ass’n v. Commonwealth, 230 Va. 384, 386, 337 S.E.2d 737, 739 (1985) (quoting Dovel v. Bertram, 184 Va. 19, 22, 34 S.E.2d 369, 370 (1945)). Rather, under the provisions of Code § 62.1-44.34:11(A)(2), the Department has been vested with the authority to review claims and to exercise discretion and judgment to determine the propriety of the claim before making disbursement. It follows that the exercise of such judgment necessarily requires that the agency review the underlying evidence in support of the claim to determine whether the claims made for disbursement are spurious or real, whether they are reasonable or not. “If nothing could be left to the judgment and discretion of administrative officers, government could not be efficient and the legislation itself would become ‘either oppressive or inefficient.’ ” Bell v. Dorey Elec. Co., 248 Va. 378, 379-80, 448 S.E.2d 622, 623 (1994) (quoting Thompson v. Smith, 155 Va. 367, 379, 154 S.E. 579, 584 (1930)). Adopting 7-Eleven’s interpretation would lead to the conclusion that, whenever a claim for damages has been made in a court of law, whether it *117 is resolved by a judgment[13] or by a settlement, the Department, in discharging the legislative mandate to determine whether the claimed costs are “reasonable and necessary,” has no authority to review the evidence relating to those costs and to determine whether the claim for reimbursement is supported in fact. The legislature has neither expressly nor implicitly declared that the evidence underlying a claim for reimbursement of costs is insulated from agency review simply because the issues were decided (or could have been decided, as in settled cases) in a judicial forum.[14] A sea change in the law of this magnitude could not have been effected sub silentio. See Hughes v. Commonwealth, 39 Va.App. 448, 461-62, 573 S.E.2d 324, 330 (2002).
Finally, I note that the result that flows from 7-Eleven’s interpretation of the statute is unequal in its treatment of claims. Under its interpretation, claimants that settle their cases are likely to enjoy a windfall recovery that other claimants do not. The settling claimant would be entitled to reimbursement not only for the actual costs that are proved, in fact, to have been incurred as a result of property damage and which are cognizable in law as recoverable, but also for *118 such costs that relate to elements that bear no real relationship to those actual costs, such as the range of verdicts, the complexity and the expected length of litigation, the expertise of counsel. A claimant who presents a claim for reimbursement of a judgment paid would be limited to its evidence of actual damages.
For the foregoing reasons, I would find that 7-Eleven’s claim that the Department was required to apply certain common law principles in its review of 7-Eleven’s settlement is inconsistent with the legislative object and purpose in enacting Code § 62.1-44.34:11(A)(2) and that the claimed reviewing principle is therefore not “so strong in its probability that the contrary thereof cannot reasonably be supposed.” First Nat’l Bank, 105 S.E. at 901. I would therefore not read into the statute by implication a requirement that the Department confine itself to a review of the reasonableness and necessity of a settlement in accordance with common law factors used to evaluate settlements and that it not review, de novo, the evidence to determine whether the claim for costs that the settlement purportedly represents is supported by the evidence and the law.
V. Conclusion
Because I would find the construction of the statute was proper and that substantial evidence supported the Agency’s findings of fact, I would affirm the trial court’s decision to sustain the agency’s decision.

. I note that the Virginia Supreme Court case, Packett v. Herbert, also stands for this proposition.

. The Department did not cite Averett for this proposition, but the case appears to imply it.

. In any event, Call’s opinion of damages was not substantially different from the figure the Department ultimately determined was reasonable and necessary. Even assuming that the Department erred in disregarding it, the error was harmless. Freeman v. Commonwealth, 223 Va. 301, 316, 288 S.E.2d 461, 469 (1982).

. Here, the estimate of lost rental income was in the amount of $710,000 (increasing at more than $140,000 per year). The estimate of lost investment income was $550,000 (increasing at about $32,000 per year). The total carrying costs were estimated to be $283,000 (increasing at a rate of about $37,000 per year). These estimated temporary losses, both separately and in the aggregate, exceeded the permanent diminution in fair market value of the property, which the Department found to be $103,111.

. Even if 7-Eleven’s carrying costs, lost profits, lost investment income, and lost rental income can be construed as consequential damages, see 2 Dobbs, The Law of Torts, supra, § 379, at 1056, the evidence fails to prove the amounts with reasonable certainty and fails to prove that the additional damages claimed were the proximate result of the tort. Id.

. Even were the factors used to review the reasonableness of settlement to be applied here to determine the reimbursement due 7-Eleven under Code § 62.1-44.34:11(A)(2), an evaluation of what damages were recoverable would generally have to be made. See, e.g., Dauphin Deposit Bank and Trust Co. v. Hess, 556 Pa. 190, 727 A.2d 1076, 1078 (1999). As discussed in the previous section, 7-Eleven’s claim that the settlement figure represented "reasonable and necessary” costs was not supported by the evidence establishing the damages it could have recovered in litigation.

. The other cases state substantially similar factors. See Pickett, 35 P.3d at 356; Community Care Centers, 716 N.E.2d at 531.

. I further note that, even were 7-Eleven’s position to be adopted, no evidence relating to the factors relevant to assessing the reasonableness of a settlement, such as the complexity of the case, the range of jury verdicts, and other such facts that 7-Eleven asked be considered, was submitted and there has been no showing that the Agency has the expertise necessary to determine the reasonableness of settlement absent such evidence.

. 7-Eleven also argues that, in cases involving a judgment, the Department and, by extension, the agency and the court are likewise precluded from evaluating the underlying evidence to determine whether the claimed reimbursement is reasonable and necessary. Rather, the agency and the court must accept the “liquidation of the underlying claim to judgment” as "establish[ing] beyond debate the reasonable and necessary cost available for reimbursement.” I also note that the only instance in which 7-Eleven believes the statute authorizes the Department to evaluate the reasonableness and necessity of the payment made in settling a claim by independently scrutinizing the underlying facts and supporting basis for that payment, is one in which compensation on a third-party claim is made outside the context of litigation. 7-Eleven provides no rationale for this distinction.

. Indeed, in a case such as the one before us, questions such as the proper measure of damages and whether the evidence supports the claim would go unreviewed under 7-Eleven’s interpretation except for a review of whether the settlement was within the expected range of jury verdicts, and met with other common law criteria for evaluating settlements.